# EXHIBIT A

# REBUTTAL REPORT
## State Farm Fire & Casualty Co. v. Keystone Custom Homes, Inc. *et al.*, 1:22-cv-0304-CCC
## Loss Location: 4057 Country Drive
## Dover, PA 17315

**Prepared by:**

**Brian R. Nettleton, P.E., CFEI**
**Director of Product Integrity**
**Daikin Comfort Technologies Manufacturing, LP**

**For:**

**HANDLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
**1 Logan Square, 27th Floor**
**Philadelphia, PA 19103**

i

**TABLE OF CONTENTS**

**SECTION**                                                                                           **PAGE**

I.   Background ............................................................................................................. 1
     A.   The Matter ..................................................................................................... 1
     B.   Qualifications and Experience ...................................................................... 1
     C.   Scope of Expert Investigation ....................................................................... 1
     D.   Summary of Rebuttal Opinions .................................................................... 2

II.  Discussion ............................................................................................................... 3
     A.   The Fire's Cause ............................................................................................ 4
     B.   Other Errors and Misstatements in the Carey Report .................................. 5

III. Signature ............................................................................................................... 10

# I. BACKGROUND

## A. THE MATTER

On November 23, 2020, Daikin Comfort Technologies Manufacturing, L.P. (f/k/a Goodman Manufacturing Company, L.P.) ("Goodman") was placed on notice of a claim by Mr. Daniel J. de Luca, with de Luca Levine, LLC on behalf of State Farm Fire & Casualty Co. ("State Farm") for a loss that occurred on November 18, 2020, at 4057 Country Drive in Dover, PA.

Goodman's legal department subsequently directed me to perform an expert investigation into this matter and then specifically to provide an opinion on the report served by State Farm of its expert Ed Carey (dated October 4, 2023) in the civil action captioned *State Farm Fire & Casualty Co. v. Keystone Custom Homes, Inc. et al.*, Civ. A. No. 22-cv-00304 (M.D. Pa.). Mr. Carey's report (the "Carey Report") is attached as **Exhibit A.**

## B. QUALIFICATIONS AND EXPERIENCE

My name is Brian R. Nettleton, P.E., CFEI. I am the Director of Product Integrity for Goodman. I graduated from the University of Missouri-Rolla with a Bachelor of Science in Electrical Engineering in 1992. From 1992 until 2002, I worked for a large manufacturer of cement in various roles and then spent the next 3 years working as a design engineer in multiple industrial facilities. In 2005, I began a career in forensics investigating fires, electrical shocks, and electrocutions, as well as assessing damage to electrical equipment. In 2018, I began my current role for Goodman. I am a registered professional engineer in multiple states and have a certification for investigating fires and explosions. Additionally, I have given testimony in multiple state, federal, and criminal courts. My curriculum vitae (CV) and testimony list for the last four years are attached as **Exhibits B and C**.

I am a salaried employee of Goodman, and thus I am being compensated for my time in this case via my salary.

## C. SCOPE OF EXPERT INVESTIGATION

I considered the following facts and data while forming my expert opinion:

On December 2, 2020, I evaluated the structure, the Heating Air Conditioning and Ventilation ("HVAC") system, Goodman furnace (Model: GMSS921004CNAA, Serial: 170166506) (the "Subject Furnace"), the natural gas system, and the electrical system at the residence to determine what role, if any, the furnace had in the cause of the fire.

Additionally, I participated in four separate joint destructive laboratory examinations of the evidence removed from the scene on the following dates: (1) June 2, 2022; (2) September 27, 2022; (3) January 10, 2023; and (4) August 22, 2023.

Moreover, I reviewed the following documents while forming my opinion:

- Northern York County Regional PD Incident Report Case No. 2020-021241.
- Transcript of Fire Marshal interview of Robert Rohrbaugh on November 19, 2020.
- Goodman produced documents but most specifically the Gas-Fired Warm Air Furnace User's Information Manual (HI-130) dated July 2014.
- Aspen Manufacturing, LLC ("Aspen") produced documents but most specifically the Aspen Installation Guide with a revision date of 6/18/2014.
- Emerson Electric Co. ("Emerson") produced documents.
- JSL Mechanical, Inc. ("JSL") produced documents.
- The deposition of Jason Makowski of Aspen on May 17, 2023.
- The deposition of Christopher Mullen of Aspen on May 17, 2023, and August 29, 2023.
- The deposition of Ryan Jensen of Emerson on May 18, 2023.
- The deposition of Joshua Benton of JSL on May 19, 2023.
- The deposition of Robert Rohrbaugh, homeowner, on May 24, 2023.
- The deposition of David Owens of State Farm Fire & Casualty Co. on September 12, 2023.
- Mr. Lee McAdams' report dated September 15, 2023.
- Mr. Edward A. Carey's report dated October 4, 2023.
- Mr. Craig D. Clauser's report dated October 4, 2023.
- NFPA 921 Guide for Fire and Explosion Investigations (2017 & 2021 versions).
- American National Standards Institute ("ANSI") standard Z21.47 (2012 edition).
- Photographs, notations, and measurements taken during the investigation.

**D.    SUMMARY OF REBUTTAL OPINIONS**

In this report, I offer the following opinions in rebuttal to the Carey Report:

1.    The Carey Report fails to address that the installation error by JSL as it relates to the improper spacing between the furnace and the evaporator coil was a contributing cause of the fire.

2.    While the Carey Report concedes that the failure of the "K3" relay on the Emerson control board was a contributing cause of the fire, the *cause* of the relay failure was never investigated or determined.

3.    The fire would not have occurred but for the homeowner's failure to turn off the Subject Furnace in accordance with the Subject Furnace's User's Information Manual. The Carey Report does not address this cause.

4.    The Subject Furnace was designed in compliance with ANSI standard Z21.47 (2012 edition). The Carey Report ignores this.

5.    Contrary to Mr. Carey's opinion, it was not feasible to position the Subject Furnace's high limit switch any closer to the top of the heat exchanger without risking that the switch would overheat and fail to function as designed.

- 3 -

      6.      The Carey Report ignores the fact that the Blower Guard Kit had not yet been created at the time of the fire and continues to be used exclusively as a repair kit for a specific recall that was issued in connection with certain Goodman-brand evaporator coils manufactured by a certain manufacturer during a certain time period, which are not at issue in this matter.

# II.   DISCUSSION

### A.   The Fire's Cause

I disagree with Mr. Carey's opinion on the fire's cause. The Subject Furnace caught fire due to a combination of three factors: (1) the improper installation of the Aspen Evaporator Coil on top of the Subject Furnace; (2) the homeowner's failure to turn off the Subject Furnace in accordance with the User's Information Manual's Instructions; and (3) the Emerson Control Board's failure to activate the blower motor.

#### 1.   Improper Installation

As an initial matter, Mr. Carey ignores that the fire would not have occurred had the Aspen Evaporator Coil been properly installed.

An evaporator coil is a component of the HVAC system that removes heat from the air using a refrigerant and is equipped with a drain pan that catches the humidity/water that the coil removes from the air. In this instance, the HVAC system was installed with an evaporator coil manufactured by Aspen (the "Aspen Coil"). The Parties do not dispute that Aspen provided the Aspen Installation Guide with the Aspen Coil. Page 2 of the Aspen Installation Guide unequivocally states: "When installing in conjunction with a gas furnace in a vertical orientation, ***ensure that there is a 2" gap between the bottom of the drain pan and the outlet of the furnace***." **Exhibit D** (Aspen Installation Guide).

Despite those clear instructions, JSL admits that it did not install the Aspen Coil with any spacing between the top of the Subject Furnace and the bottom of the drain pan. JSL Dep. Tr. at 110:12-13. JSL's failure to do so was a contributing cause to the fire. Aspen requires such a gap to "avoid the radiant heat of the furnace." Aspen (Makowski) Dep. Tr. at 75:20. The primary method of heat transfer in a "no blower" situation is via radiation. Radiation is the transfer of heat energy from a hot surface or gas to a cooler material by electromagnetic waves, which is how the earth is warmed by the sun. In such a situation, the distance between the two surfaces affects the heat energy that is absorbed by the cooler surface. For example, because the earth is further from the sun than the planet Mercury, the surface temperatures are significantly cooler on the earth than on Mercury.

The same principle applies to the distance between the drain pan and the furnace heat exchanger tubes. For example, if there is one inch separation between the drain pan and the heat exchanger tubes, the drain pan can absorb more heat energy than if there were two inches of separation. Utilizing the inverse square law, by cutting the distance in half (from 2 inches to 1 inch), four times more heat energy could be transferred into the drain pan from the heat exchanger tubes. Additionally, with less distance between them, a plastic drain pan warped from the heat energy would more easily come in contact with the heat exchanger tubes than if it had the proper clearance. Had the Aspen Coil been installed according to the Installation Guide (i.e., with two inches of clearance between the top of the Subject Furnace and the bottom of the drain pan), the high limit switch would have shut the Subject Furnace down before the drain pan could have become hot enough and then warped enough to contact the heat exchanger tubes and ignite. Thus, the fire would not have occurred but-for JSL's failure to properly install the Aspen Coil.

2. <u>The Homeowner's Failure to Follow the User's Information Manual</u>

The Carey Report fails to address the fact that the fire would not have occurred had the homeowner followed the User's Information Manual's clear instructions. The Gas-Fired Warm Air Furnace User's Information Manual (HI-130) dated July 2014 (the "User's Information Manual") provides: "If the LED is flashing, record the number of flashes seen in sequence, shutdown your unit as outlined in the 'Furnace Start-up' section and contact a qualified servicer for further troubleshooting and/or repairs." **Exhibit E** page 8.

The homeowner (Robert Rohrbaugh) failed to adhere to that explicit instruction. On the day of the fire, the homeowner attempted to turn the Subject Furnace off and on several times. Rohrbaugh Dep. Tr. at 31:13-14. Thereafter, he saw "four blinking lights" on the Subject Furnace. *Id.* at 31:24. However, rather than turning off the Subject Furnace and contacting a technician in accordance with the User's Information Manual, Mr. Rohrbaugh repeatedly attempted to turn the Subject Furnace on. Had he not done so, the (improperly installed) drain pan would not have been able to reach a high enough temperature to warp and then ignite. Consequently, the fire would not have occurred had Mr. Rohrbaugh followed the User Information Manual's instructions.

3. <u>The Emerson Control Board's Failure</u>

In this case, the Emerson Control Board's K3-Relay failed, and, as a result, the blower motor (a fan that pushes air through the Subject Furnace) was not energized causing heat to build up in the Subject Furnace. Had the Aspen Evaporator Coil and its drain pan been installed with the proper clearance, this factor could not have caused the drain pan to reach sufficiently high temperatures to ignite.

As Mr. Carey admits "a complete blower failure in a gas furnace, is a common failure that occurs with many gas furnaces." **Exhibit A** page 11. Yet Mr. Carey failed to perform any investigation into why the Emerson Control Board's K3 Relay failed. It is thus impossible to rule out that the K3 Relay's failure was caused by normal, expected wear-and-tear.

**B.    Other Errors and Misstatements in the Carey Report**

The Carey Report also contains the following errors and misstatements:

1. <u>Mr. Carey's Opinion on the Location of the High Limit Switch Is Unfounded</u>

The Subject Furnace is equipped with a component part referred to as a "High Limit Switch." The High Limit Switch's primary function is to prevent the Subject Furnace's maximum outlet temperature from exceeding 170 degrees F. Thus, if air inside the Subject Furnace exceeds 160 degrees F for an extended period, the High Limit Switch is activated and shuts the Subject Furnace down.

In this case, Mr. Carey contends that "the temperature limit switch (primary limit) is not installed in the Goodman furnace at a location that would monitor the hottest temperatures in the gas furnace." **Exhibit A** page 30. Mr. Carey concludes that this led to the fire because "the temperatures at the top of the gas furnace, and specifically at the location of the A/C evaporator

coil and condensate drain pan, rose significantly above Goodman's 170-degree F maximum outlet temperature of the gas furnace" when the blower motor was turned off during post-fire testing. *Id.* page 31. This opinion is incorrect for three reasons:

*First*, Mr. Carey contends that the placement of the High Limit Switch must have been defective because the Subject Furnace reached temperatures exceeding 170 degrees F for short periods of time. **Exhibit A** page 31. But the 170-degree F maximum outlet temperature that the Subject Furnace is rated for – and that is approved by ANSI – applies only to sustained temperatures. It does not apply to short spikes in temperature, also known as "excursions," that quickly return below 170 degrees F. The short temperature spikes that Mr. Carey relies upon thus fail to show that the High Limit Switch did not function as intended.

*Second*, Mr. Carey ignores that the High Limit Switch's placement in the Subject Furnace complied with ANSI standards. ANSI – the premier third-party ratings agency for HVAC units – promulgates safety, efficiency, and reliability standards that each furnace must meet to be deemed ANSI certified. In this case, the Subject Furnace met all requirements for, and was qualified as, compliant with ANSI standard Z21.47 (2012 edition). To meet this qualification, Goodman was not obligated to place the High Limit Switch near the "hottest point" of the Heat Exchanger. Rather, it was required to ensure that the Subject Furnace's outlet temperature did not exceed 170 degrees F for an extended time. The testing data produced by Goodman shows that it met this requirement. See **Exhibit F** (Goodman Testing Data).

*Third*, Mr. Carey fails to address the feasibility of placing the High Limit Switch in the location he suggests. As Mr. Carey notes, the top of the heat exchanger is the hottest part of the Subject Furnace. If Goodman were to place the High Limit Switch any closer to this location, it would be directly adjacent to the flames from the burners. Placing the switch so close to the burners would subject it to a significant amount of heat from the burners and would subsequently exceed the temperature rating for the wires connected to it and the switch itself. The current location of the High Limit Switch is extremely reliable, and the testing results are repeatable, this has been verified through years of experience and testing. Additionally, to my knowledge, other residential gas furnace manufacturers put their High Limit Switch in approximately the same location. The location suggested by Mr. Carey would cause the High Limit Switch to fail.

    2. <u>Mr. Carey's Opinion That Goodman Should Have Installed a "Blower Guard Kit" Is a Red Herring</u>

Mr. Carey faults Goodman for failing to equip the Subject Furnace with a Blower Guard Kit ("BGK"). Specifically, Mr. Carey contends that "testing revealed that with the BGK installed, and a complete blower failure occurring in the subject gas furnace, employing the features of the BGK, the subject gas furnace was shut down at significantly lower temperatures, preventing severe overheating of the gas furnace." **Exhibit A** page 32. The approach that Mr. Carey faults Goodman for failing to adopt was not feasible – and thus cannot be relied on to fault Goodman – for two reasons:

*First*, the Blower Guard Kit is used exclusively as a recall repair kit. In 2021, Goodman issued a recall on specific models of its own brand of evaporator coils that were manufactured

- 6 -

during a specific date range by a specific third-party drain pan supplier, because it learned that that supplier used deficient materials when manufacturing drain pans that were incorporated into, and sold as a component of, certain Goodman-brand evaporator coils. To resolve the fire hazard created by these specific drain pans – that are not at issue in this matter, which involved an Aspen drain pan – Goodman created the BGK.

*Second*, the Blower Guard Kit did not exist when the fire occurred. The Subject Furnace was manufactured in January of 2017, and the fire occurred in November of 2020. Yet the Blower Guard Kit was not created until 2021, following the completion of months of nuanced design, testing, and manufacturing requirements related to specific Goodman-brand drain pans manufactured between 2019 and 2021. It thus was not feasible for Goodman to include in its product technology that had not been created when the fire occurred.

### 3. Goodman Adequately Tested the Subject Furnace

Mr. Carey attempts to pin the fire's cause on a lack of testing performed by Goodman. Specifically, Mr. Carey asserts that "when the gas furnace was originally tested by Goodman prior to manufacturing, testing was not performed employing real-world conditions such as testing the gas furnace with an A/C evaporator coil and a plastic condensate drain pan, mounted on top of the furnace. Also, the gas furnace was not tested in the condition of a complete blower failure in the gas furnace, both of which are very common occurrences in the HVAC industry." **Exhibit A** page 36.

In Mr. Carey's view, "if Goodman had properly tested the gas furnace and realized that it had the ability to generate extremely high temperatures, well above their maximum rated outlet temperature of 170 degrees F," "the features of the Blower Guard Kit could have been incorporated," or Goodman "could have required the gas furnaces be installed with condensate drain pans made of metal, and/or Goodman could have required additional clearance from the top of the gas furnace to the drain pan, as they do with oil furnace installations." **Exhibit A** page 37.[1]

Mr. Carey misses the mark. As an initial matter, Mr. Carey assumes that Goodman did not perform such tests because Goodman has been unable to find additional design-phase testing documentation from ***nearly ten years ago***. However, the mere fact that Goodman is unable to locate additional testing information does not mean the tests Mr. Carey describes were not performed. To the contrary, Goodman frequently tests its furnaces in a state of complete blower motor failure during the design phase.

Moreover, and more fundamentally, Goodman performed all tests required by ANSI. For products to be marketable in the United States, the products must meet certain safety standards. For gas fired furnaces, that standard is written by ANSI and is published as ANSI Z21.47. The standard is approximately three hundred pages of specifications and testing requirements, each of which must be met for a furnace to be listed. Third party laboratories ETL and Intertek verified that the Subject Furnace met those requirements and subsequently listed the furnace. It

---

[1] Mr. Carey ignores that two inches of clearance between the top of the Subject Furnace and drain pan *were* required but not implemented in this case.

is therefore my opinion that there is no evidence that inadequate testing of the Subject Furnace caused the fire.

    4. <u>Additional Errors and Omissions</u>

Finally, Mr. Carey's Report contains the following errors:

- On page 2 of his Report, Mr. Carey states: "The Aspen A/C evaporator coil was connected by refrigerant lines and electric wires to the Goodman A/C condensing unit, which was located on the ground, on the exterior of the home." The Aspen Coil did have refrigerant lines connected to it; however, there were no wires attached to the Aspen Coil.

- On page 3 of his Report, Mr. Carey states: "Since JSL got the Aspen A/C evaporator coil from Goodman as a substitute for the Goodman A/C evaporator coil that was ordered, documents in evidence show that JSL obtained the replacement plastic condensate drain pan under a 'no charge' warranty." Mr. Carey then references an invoice to JSL, N843027 dated 10/18/2017. However, in an email written by Mr. Rohrbaugh dated February 27, 2023, he states: "Sometime in the summer of 2017 I took notice of about a four-foot circle of standing water around the furnace. I called JSL to come look at the problem." I find it very unlikely that JSL would have ordered a replacement drain pan in the summer of 2017 without being invoiced for it by Goodman until October of 2017. More likely than not, the October invoice is for a separate drain pan, not the subject drain pan.

- On page 4 of his Report, Mr. Carey states: "They then removed the defective plastic condensate drain pan and installed the replacement plastic condensate drain pan onto the bottom of the A/C evaporator coil." Mr. Carey never saw or examined the removed drain pan. And JSL Mechanical, Inc. testified that the drain pan was cracked. *See* JSL Mechanical, Inc. Dep. Tr. at 19, 64, 65, 66. There is no reason to believe that this crack was caused by any defect to the drain pan.

- On page 31 of his report, Mr. Carey states: "With a condition of complete blower failure and no forced air movement through the gas furnace … the surface of the condensate drain pan reached temperatures as high as 378 degrees F." But Mr. Carey measured the air *near* the drain pan. He did not measure the temperature of the drain pan itself. And the air near a plastic drain pan reaches significantly hotter temperatures than the actual drain pan. See thermocouple locations in **Figure 1** below.

- Finally, the exemplar evaporator coil purchased by Mr. Carey for testing in the laboratory contained a ***metal*** drain pan. However, as Mr. Clauser concedes, the drain pan installed at the Rohrbaugh residence was made of ***plastic***. This undermines the credibility of Mr. Carey's investigation and the Carey Report.

- 8 -

- 9 -



**Figure 1**: Note, thermocouples are attached to metal support for drain pan, not the actual drain pan itself. The drain pan is black in color.

## III. SIGNATURE

      I hereby certify the expressed opinions and conclusions have been formulated within a reasonable degree of professional certainty. They are based upon all the information known by me as of the time this report was issued, as well as knowledge, skill, experience, training, and/or education.

Date: November 1, 2023
Report Prepared By:

*[signature]*

Brian R. Nettleton, P.E., CFEI
Director of Product Integrity
State of Texas
License No. 129582